UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAVID B.,[1]
                                        Plaintiff                    DECISION and ORDER

-vs-                                                                 1:22-CV-06087 CJS

COMMISSIONER OF SOCIAL
SECURITY,
                                        Defendant.
_____


INTRODUCTION

    This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination

of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the

application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits and

Supplemental Security Income ("SSI") benefits.   Plaintiff contends that the Commissioner erred,

primarily by failing to adequately account for his inability to control his anger, when determining

his residual functional capacity ("RFC"):

> The primary medical issue concerns Plaintiff's issues with anger, irritability, and
> aggression.   The fundamental source of the error here is that the ALJ's RFC does
> not properly account for Plaintiff's actual psychiatric impairments because it does
> not properly limit his interactions with supervisors or co-workers (which is contrary
> to all medical opinions and to the medical evidence).

Pl. Memo of Law, ECF No. 8-1 at p. 4.[2]   Now before the Court is Plaintiff's motion (ECF No. 8)

_____

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the
United States District Court for the Western District of New York, any non-government party will be identified and
referenced solely by first name and last initial."
[2]  The reader is advised that the page numbers assigned to documents by the CM/ECF filing system may be
different than the page numbering of the original document.

for judgment on the pleadings and Defendant's cross-motion (ECF No. 10) for the same relief. For reasons discussed below, Plaintiff's application is denied, and Defendant's application is granted.

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[3] which significantly limits his physical or mental ability to do basic work activities.[4] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[5]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[6]

---

[3]  "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[4]  The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[5]  Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[6]  "The Commissioner's burden at step five is to show the existence of possible employment for an individual with

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the

---

the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec*., No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original; citations and

internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).   "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

Also, when considering whether a particular finding or decision is supported by substantial evidence, a court may not rely on any *post hoc* rationalizations offered by the Commissioner, but may consider evidence that was evidently considered by the ALJ even if it was not expressly

mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982). In *Berry*, we noted that, although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id. See also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ....")."); *see also*, *Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.').").

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff dropped out of school in the eleventh grade but eventually obtained his GED diploma.   Prior to the alleged disability onset date, Plaintiff's most-recent past relevant work included lumber-yard laborer, gas-station attendant, and restaurant line-cook.[7]   Even prior to his claimed disability, Plaintiff, who was 45 years of age at the alleged onset date and a married father of five children, had a rather modest work history, both in terms of earnings and amount of time worked.[8]

Plaintiff claims that he became disabled on January 1, 2018, primarily due to problems with anger and depression, which he somewhat vaguely attributes to the death of his mother almost twenty years earlier.[9]   In that regard, upon first seeking mental health treatment in April 2019, Plaintiff told an evaluator that for most of that time since his mother's death, he had been merely angry, but that he had become enraged more recently, after an acquaintance insulted his mother's memory. *See*, Tr. 405 (From intake evaluation notes: "Describe symptoms and impact on functioning: Anger: Was anger until 2 weeks ago, now it's rage.   Mom died 16 years ago; niece's BF [boyfriend] spoke about his mother – anger ensued."); *see also*, Tr. 330 ("December 1, 2002. That was the day my mother was taken from me.   And then earlier this

---

[7]  Plaintiff has maintained that his last job was at the Red Lobster restaurant, where he worked for one month, between August 2018 and September 2018. (Tr. 334).   Although, he has also indicated that his last job was at a Denny's restaurant, and this discrepancy is not explained in the record.

[8]  In that regard, Plaintiff's earnings record shows that between 1992 and 2018, he had: two years with no reported earnings; six other years with earnings of less than one thousand dollars; three other years with earnings of less than two thousand dollars; eleven other years with earnings of less than ten thousand dollars; and five other years with earnings of less than twenty thousand dollars.   Indeed, Plaintiff never had reported earnings above seventeen thousand dollars in any year. (Tr. 263).   Plaintiff indicated that he was unemployed in parts of 1998, 2000, 2008, and 2009, and that he worked only part-time in 2013. (Tr. 240).

[9]  *See, e.g.*, Tr. 411 ("[S]elf-describes as struggling internally after he lost his mother 17 years ago.   . . . Mother passed away a short while after client's cousin was killed and client has lived ever since with that feeling of loss and internalized anger.   Never had therapy and did not seek any treatment before.   He indicates carrying that heavy feeling and being short tempered in any situation unpredictably.   . . .   Impression: Dysthymia reacted to unresolved grief.").

year [(2019)] a punk that didn't know her told me he was gonna spit on her grave, something snapped.").   Notably, this alleged incident leading to Plaintiff's "rage" did not occur in the workplace and had nothing to do with his employment.

As Plaintiff's mental health therapy continued, he claimed more generally to have longstanding depression, in addition to anger, and an inability to be around other people, especially while at work or out in public. See, Tr. 323 ("I don't like large groups of people.   I'm always depressed."); Tr. 331 ("I don't like to go out around people.").   In terms of his alleged disability, however, Plaintiff primarily contends that it is his anger, and lack of sel-control when angry, that prevents him from working.

More specifically, Plaintiff contends that he has "anger issues" that prevent him from functioning properly around supervisors, coworkers and the general public. Tr. 405 ("I can't work because people say stupid things and I get angry.").   As evidence of this, upon seeking counseling in April 2019, Plaintiff told his treatment providers that he had lost multiple jobs due to his inability to control his anger. Tr. 411 ("He eventually lost his jobs for same reasons of poor anger management and loss of self control."); Tr. 608 ("Has been struggling with anxiety and anger management problems which has reportedly prevented him from holding a job.").

Although, Plaintiff has been inconsistent in explaining when his anger issues or poor self-control ever resulted in him losing a job.   In Plaintiff's disability questionnaire, completed on September 22, 2019, he was asked, "Have you any problems getting along with bosses, teachers, police, landlords, or other people in authority"" and he answered by checking both "yes" and "no," adding "depends on the situation." On the same questionnaire, Plaintiff was asked, "Have you ever lost a job because of problems getting along with people?", and he

answered "yes," citing a single incident: "I left work 1 night and forgot my phone charger.   I called the cook to ask him to put it up, and he started running his mouth.   I went back up there after him." (Tr. 330).   Plaintiff did not explain what happened next that supposedly led to him being fired, or indicate when or where this incident allegedly occurred.[10]

On a later occasion, October 14, 2019, Plaintiff told a consultative examiner about another instance of him losing a job due to anger, involving an alleged altercation between himself and a female supervisor.   Notably, Plaintiff indicated that the incident was the reason that his last job had ended:

> He is not employed at this time.   He last worked in 09/18 as a cook, and held that job for two weeks before getting into a physical altercation with his female boss. The claimant indicated that he was told he would be getting approximately 30 hours of work a week, but he was only being given 12 hours a week.   When he asked his boss about this, she reportedly laughed at him, which resulted in him grabbing her by the shirt collar, and then letting her go and walking off of the job.

Tr. 430.

However, on August 31, 2020, Plaintiff testified somewhat differently about this alleged incident, omitting any reference to grabbing his supervisor's collar:

Q. Okay.   And have you ever have physical altercations? [sic]

A. When I was working at Red Lobster, it was, it was physical, but it wasn't – I mean, I was – when I got hired there, I was told I was going to start out working 30 hours a week, and I was getting six hours a week.   And I went to the manager and asked the manager why I was only getting six hours a week, and she basically just laughed in my face and started poking my chest.   And I just (INAUDIBLE) moved back a couple of feet and let her go.

---

[10]  Also in September 2019, Plaintiff's wife completed a questionnaire in which she was asked, in pertinent part, whether Plaintiff had ever been "fired or laid off from a job because of problems getting along with other people," and she answered "yes," explaining: "David did not like how manager spoke to him and had asked him to leave. This has happened multiple times. Denny's restaurant and Mooney's." (Tr. 348).

(Tr. 59) (questioning by Plaintiff's attorney).

Plaintiff also testified concerning an entirely different incident that allegedly led to the loss

of his "last job":

[ALJ]: Okay.   All right.   So, we're just going to look at your past work.

ATTY: You Honor, I did want to just discuss the last work at Denny's[11] where he worked for a month.   . . .   Can you tell the Judge how that job ended, why it ended, David?

[Plaintiff]: Yeah.   I went in on the day I was scheduled.   One of the store managers.   I was working in the kitchen.   So, my – the head manager said he was in a bad mood.   He didn't want to be there, whatever the case may be.   I went into work.   He didn't want, he didn't want to be there; he didn't want me to be there.   So, I told him – he, he wanted to argue with me.   He told tell [sic] that he didn't need me there, and just go home.   So, I went home.   And (INAUDIBLE)--

[ATTY]: Okay.   Was there any physical altercation involved?

[Plaintiff]:   No, no.   He didn't get close enough to me.   And that's   . . .   that's the, (INAUDIBLE).   He wasn't close enough.   He just kept, just kept yelling and screaming, and, and I, I – the way I see it, I didn't have to deal with it.

Tr. 52.[12]

Plaintiff indicates that his anger issues affect him outside of work as well.   For instance,

Plaintiff testified at the administrative hearing that he does not drive a car because he is

---

[11]  Again, it is unclear from the record exactly when Plaintiff worked at Denny's.   In April 2019, Plaintiff told a therapist that he had "recently left [a] job at Denny's" (Tr. 407), though he did not list that job when he applied for disability benefits a few months later. (Tr. 334).

[12]  The Court observes that, not only are these statements inconsistent with each other, but, except for the statement that Plaintiff made to the consultative examiner, they do not indicate that Plaintiff lost employment due to his own anger issues or loss of self-control.   Rather, they indicate that his loss of employment resulted from incidents in which his supervisors or co-worker exhibited unreasonable anger or loss of self-control.

concerned that he may end up in a "road rage" situation due to his anger problem. (Tr. 61-62) ("Q. Do you drive, Mr. B[ ]?   A. No.   Q. Why not?   A. I'm afraid to drive. Q. Pardon me?   A. Road rage.   I, I, I'm kind of afraid to drive because of road rage, because I get irritated real easy, and that's all it would take, and I, I can't do that.").   Although, Plaintiff told his therapist that he drives, but not during rush hour. (Tr. 497).   Plaintiff's wife, meanwhile, indicated that he does not drive because he cannot afford to review his driver's license (Tr. 345), which is consistent with Plaintiff's prior statement in a disability questionnaire that he does not have a license. (Tr. 326).

On August 19, 2019, Plaintiff applied for SSDI and SSI benefits, claiming to be disabled due to mental impairments that he described as "persistent depressive disorder," "PTSD," "anxiety," and "depression." (Tr. 302).[13]   Functionally, when asked to state how his alleged mental impairments affected his activities, Plaintiff stated, "I don't like large groups of people," and "I'm always depressed." (Tr. 323).

The record indicates that when Plaintiff is not working, he spends much of his time playing games on his phone and hunting.[14]   Plaintiff reported a history of alcohol abuse, and admits to using marijuana frequently.   Indeed, Plaintiff told a consultative examiner that he currently uses marijuana "as often as [he] can."[15]

_____

[13] Plaintiff later claimed to also have physical impairments.   Interestingly, the mental health treatment notes suggest that Plaintiff "found" that he had these alleged physical impairments while preparing his disability application. *See*, Tr. 485 ("Client is going through the disability process and reported that have found [s]ome physical things as well.")

[14] Tr. 72 ("plays video games"); 343, 346 (Spends much of the day playing games on phone); Tr. 555 (Spends time hunting to feel better: "Cl. Reports that he has been hunting to help him feel better. 'I go out as much as I can during the week.'"); (558) ("David reports that hunting also helps him feel better.").

[15] Tr. 74 ("smokes marijuana frequently"); Tr. 408 (Plaintiff was reported to Child Protective Services ("CPS") for having allegedly having a child purchase marijuana for him.   The record indicates that CPS eventually closed the complaint but recommended that Plaintiff obtain substance abuse counseling at "Trinity," apparently referring to

After Plaintiff's claim was denied initially, he had a hearing before an ALJ, who, on March 3, 2021, issued a Decision denying Plaintiff's claim. (Tr. 15-27). The ALJ applied the five-step sequential evaluation and found, in pertinent part, that Plaintiff had severe mental impairments, "variously characterized" in the medical records as "persistent depressive disorder, cannabis dependence, posttraumatic stress disorder by report, rule out intermittent explosive disorder, dysthymia." (Tr. 18).   The ALJ indicated that regardless of the various titles that were used to describe Plaintiff's mental impairments, she had considered their combined impact on Plaintiff's ability to perform basic work functions. (Tr. 18).

The ALJ found, on the other hand, that none of Plaintiff's alleged physical impairments, such as back pain, knee pain, elbow pain, and hand tremors, were severe, observing, for example, that, "the minor abnormalities identified during physical examinations are contradicted by the claimant's broad range of activities, including hunting for deer and weightlifting." (Tr. 18-19).[16]

The ALJ further found that none of Plaintiff's impairments, either singly or combined, met or medically-equaled a listed impairment.   In that regard, the ALJ found, in pertinent part, that Plaintiff's mental impairments caused him only "moderate difficulties in interacting with others." (Tr. 19).   In discussing that finding, the ALJ observed that, "the claimant stated that he has problems getting along with family, friends, and people in authority[, y]et, [consultative examiner] Dr. [Amanda] Slowik[, Psy.D.] described the claimant as cooperative with fair social skills." (Tr.

---

Trinity of Chemung County, a substance abuse agency in Elmira. See, Tr. 592 ("CPS closed his case and client was very upset about the recommendation of TRINITY due to his pot smoking."); (Tr. 431) ("He began using marijuana in 1990 and smokes, 'As often as I can.'").   Plaintiff also indicated that he had a history of alcohol abuse.   Strangely, though, nurse practitioner Pierre Ngili, NPP, who treated Plaintiff for depression, asserted in his medical disability questionnaire that Plaintiff had no history of drug or alcohol abuse. (Tr. 482).
[16]Plaintiff does not object to that finding in this action.

20).

The ALJ also referred to the opinions of state agency medical consultants,[17] who, in pertinent part, agreed that Plaintiff had only "moderate" limitation in interacting with others. (Tr. 20, 68, 99, 112).   In that regard, a medical consultant indicated that Plaintiff was "not significantly limited" in "the ability to work in coordination with or in proximity to others without being distracted by them," and that he was "moderately limited" in "the ability to interact appropriately with the general public," "the ability to accept instructions and respond appropriately to criticism from supervisors," and "the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (Tr. 72-73, 102-103, 115-116).   A consultative examining psychologist summarized Plaintiff's ability for social interaction by stating, "The cl[aimant] exhibits difficulty with social interaction but could be successful in a job requiring minimal supervision and interactions with others." (Tr. 75, 88, 104, 117).

The ALJ next found that, despite Plaintiff's impairments, he retained the RFC to perform simple work requiring limited social interaction:

> The claimant has the residual functional capacity to perform a full range of work at all exertional levels.   The claimant retains the ability to: understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; handle simple, repetitive work-related stress in that claimant can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others; should avoid work requiring more complex interaction or joint effort to achieve work goals; and can have no contact with the public.

---

[17]  J. Ochoa, Psy. D. (Tr. 68-69);

Tr. 20-21; *see also, id*. at 24 ("Moderate limitations in the 'B' criteria above were accounted for by limiting the claimant to simple work with very limited social contact.").

In explaining this RFC finding, the ALJ indicated, again, that she found persuasive the opinions of the state-agency consultants, who opined that Plaintiff had moderate limitations but was capable of performing simple work involving limited social contact:

> The undersigned has interpreted the moderate limitations identified in the prior administrative medical findings . . . to mean that the claimant is capable of performing simple work that entails simple, repetitive work-related stress with limited social contact.   The undersigned is persuaded by the opinions . . . because they are supported by the mental status examinations in record.   These opinions are consistent with the fact that the claimant reported improvement with his psychological symptoms with treatment. In addition, the opinions . . . are supported by counseling records indicating that he should avoid working in places where he has to be confronted by public demands, which the undersigned has accounted for by restricting him to no contact with the public.

(Tr. 22).[18]

However, the ALJ indicated that she was "not very persuaded" by the opinions of Plaintiff's mental health treatment providers or the consultative-examiner psychologist, which asserted that Plaintiff also had certain moderate-to-marked limitations.   More specifically, in September 2020, Ngili and Stephanie Hostrander, LMSW, completed a two-page check-the-box questionnaire, asserting that because of "dysthymia" and "PTSD", Plaintiff had "marked" limitations in maintaining regular attendance without interruptions from psychologically-based symptoms and in performing activities within a schedule, and "extreme" limitation in the "ability to respond

---

[18] In the last sentence of this quoted language, the ALJ was indicating that the agency physician's opinions were consistent with a treatment note from nurse practitioner Pierre Ngili, NPP ("Ngili"), from Family Services of Chemung County, describing Plaintiff as "[a] client with ongoing irritability and feeling angry after loss of the mother.   Otherwise functioning optimally except in work places or where he has to be confronted by public demands." (Tr. 415).

appropriately to ordinary stressors in a work setting with simple tasks." (Tr. 480).   That same questionnaire, incidentally, said nothing concerning Plaintiff's ability to accept supervision or to work with or around other people.   Meanwhile, consultative examiner Amanda Slowik, Psy.D., indicated, in pertinent part, that Plaintiff's "ability to interact adequately with supervisors, coworkers, and the public, sustain an ordinary routine, and regulate emotions is moderately to markedly limited.   Difficulties are caused by distractibility, anger management problems, a low mood, and anxiety." (Tr. 433).

Again, the ALJ found that insofar as the opinions of Ngili, Hostrander, and Slowik, indicated more than moderate limitations, they were "not very persuasive," stating in pertinent part:

> [T]he significant restrictions identified [by treatment providers Pierre Ngili, NPP and Stephanie Hostrander, LMSW, and consultative examiner Amanda Slowik, Psy.D.] are contradicted by the mental status examinations in record and the fact that the claimant reported to improvement with his psychological symptoms with treatment. . . .   [The] clinical findings support the conclusion that the claimant has some mental restrictions, [but] they do not support the extreme restrictions identified by the[se] opinions[.]   . . . NPP Ngili and LMSW Hostrander do not provide any objective findings to support the degree of restrictions being alleged.

(Tr. 22).   The ALJ later went on to discuss numerous examples of normal mental-status-exam results, and reiterated that, "These clinical findings undermine the significant restrictions identified by Dr. Slowik, NPP Ngili and LMSW Hostrander." (Tr. 23).

As a further reason for discounting the opinions of Ngili, Hostrander, and Slowik, the ALJ observed that Plaintiff's condition improved quickly and significantly once he began taking medication. (Tr. 24).   In that regard, the ALJ cited numerous instances in the treatment records where Plaintiff indicated that his medications were working well. (Tr. 24).   For example, the ALJ

noted:

> The claimant's psychological symptoms improved with treatment.   For instance, after his medications were adjusted, the claimant stated that he was doing well without any complaints.   NPP Ngili indicated that the claimant appeared calm and more composed with improved sleep and energy.   . . .   In December 2019, the claimant stated that Zoloft was working well for him in addition to therapy.   He further advised that he felt more balanced and less angry.   The claimant denied experiencing anxiety and depression.   In January 2020, the claimant stated that he was happy.   In March 2020, the claimant, again, voiced less anger and aggression, and he reported things were going well.   He stated that the "Zoloft is working very good."   In May 2020, the claimant stated that he has been doing so much better on his medication, and he presented with less anger and aggression. The claimant stated that his relationship with his wife was good.   In June 2020, the claimant stated he felt good, and he was weaning himself off medication.

(Tr. 24) (citations to record omitted).

The ALJ further noted that, apart from the aforementioned moderate-to-marked limitations opined to by Ngili, Hostrander, and Slowik, which she found unpersuasive, the medical evidence clearly indicated that Plaintiff had no significant limitations with regard to the other mental requirements of work:

> [T]he claimant acknowledged that he could follow spoken and written instructions. Amanda Slowik, Psy. D., a consultative examiner, stated that the claimant had no limitations in his ability to understand, remember, or apply simple directions and instructions; and has mild limitations for understanding, remembering, or applying complex directions and instructions.   Dr. Slowik indicated that the claimant's thought processes were coherent and goal directed.   Socially, the claimant stated that he had problems getting along with family, friend, and people in authority.   Yet Dr. Slowik described the claimant's attention, concentration, and recent and remote memory skills as mildly impaired.

(Tr. 19-20).

An additional factor in the ALJ's RFC finding is that she did not find Plaintiff's own

statements about the severity of his symptoms to be entirely credible.   For example, the ALJ pointed out that, contrary to Plaintiff's claim that he is unable to get along with people, he told a treatment provider that he was "easy to get along with." (Tr. 23).   Indeed, Plaintiff listed his ability to get along with others as one of his personal strengths. (Tr. 557).   Moreover, the ALJ noted that despite Plaintiff's allegation that he became disabled on January 1, 2018, he continued to work throughout 2018, even though such work did not rise to the level of substantial gainful activity, based on earnings.[19]   That is, Plaintiff continued to work, though at a level below SGA, in a setting that involved contact with supervisors and co-workers, for a year after his alleged disability onset date.   Moreover, the ALJ indicated that Plaintiff's claims concerning his alleged physical impairments were belied by his robust activities, such as hunting and weightlifting.   And, again, the ALJ noted that the mental-status exam findings frequently appeared inconsistent with Plaintiff's self-reported mental symptoms.

To summarize, the ALJ found, based upon all the aforementioned factors, that Plaintiff retained the RFC to perform simple work that did not involve either complex interaction or joint effort with others at work, or contact with the public.

The ALJ next found, at the fourth step of the sequential evaluation, and based on testimony from the VE, that with the RFC set forth earlier, Plaintiff could perform his past relevant work as a kitchen helper.   Alternatively, the ALJ found, at the fifth step, that Plaintiff could

---

[19] *See*, Tr. 18 ("Although the claimant alleges disability beginning on January 1, 2018, the record shows posted wages during the third quarter of 2018 of $2,334 and $489 during the fourth quarter of 2018.   These earnings do not rise to the level indicative of substantial gainful activity but will not be ignored in determining whether the claimant is medically disabled."); *see also, id.* at 24 ("As noted earlier, the claimant also engaged in work activity after his alleged onset of disability.")   Plaintiff showed total reported earnings of $6241.76 for 2018. (Tr. 263). Plaintiff's average reported earnings over the prior three years was $14,712. (Tr. 263).

perform other specified jobs as well, and that he was therefore not entitled to disability benefits. (Tr. 24-26).

Plaintiff appealed, but the Appeals Council declined to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.

On February 22, 2022, Plaintiff filed the subject action, seeking review of the Commissioner's decision under 42 U.S.C.A. § 405(g).   Plaintiff first asserts that the ALJ's RFC finding was erroneous, since it did "not properly account for Plaintiff's limitations in social functioning."   Primarily, in that that regard, Plaintiff maintains that the RFC finding should have limited him to work requiring "minimal supervision" and "minimal interaction" with co-workers, and that the ALJ's failure to make such a finding resulted from her improper evaluation of the medical opinion evidence.   Plaintiff further argues that the ALJ failed, when assessing the impact of his mental impairments, to adequately consider his subjective complaints and, instead, placed too much emphasis on the observations of medical providers (who frequently reported benign mental-status-exam findings).

More specifically and comprehensively, and as discussed further below, Plaintiff contends that the ALJ erred in the following seven ways:

[(1) T]he ALJ fails to properly account for the full extent of Plaintiff's anger, irritability, and aggression by properly limiting his ability to interact with supervisors and coworkers; (2) the ALJ fails to explain why she rejects (or fails to properly account for) portions of the medical opinions she finds to be persuasive (namely that Plaintiff requires "minimal" supervision and interactions with others); (3) the ALJ improperly assesses the opinions of Plaintiff's treating mental health care providers and Defendant's own consultant; (4) the ALJ fails to properly reconcile the longitudinal records by cherry picking some notations of improvement but failing to consider the overall record including evidence of subsequent deterioration; (5) the ALJ fails to consider a closed period of benefits; (6) the ALJ

18

improperly concludes Plaintiff can perform past work as a kitchen helper; and (7) the ALJ used an incomplete hypothetical with the vocational expert resulting in testimony that cannot support Defendant's Step 5 burden.

Pl. Memo of Law, ECF No. 8-1 at p. 3.

Defendant opposes Plaintiff's application and cross-moves for judgment on the pleadings,

asserting that the ALJ's decision is free of legal error and supported by substantial evidence.

More specifically, Defendant states:

> The Administrative Law Judge (ALJ) found that Plaintiff's mental impairments, while limiting, did not preclude the performance of a range of simple work with consistent job duties, no contact with the public, and avoiding more complex interactions, consistent with his past relevant work as a kitchen helper, as well as other work existing in significant numbers in the national economy. In reaching this conclusion, the ALJ properly considered the various opinions in the record, along with Plaintiff's limited and successful course of treatment, response to medication, largely normal mental status examination findings, and daily activities. Plaintiff disagrees with the ALJ's interpretation of the evidence, but he fails to show that a reasonable factfinder would be compelled to find him more limited. Because the decision is supported by substantial evidence and free of legal error, the Commissioner's decision should be affirmed.

> Plaintiff also argues that the ALJ was required to consider whether Plaintiff was entitled to a closed period of disability. However, Plaintiff failed to request a closed period of disability during the administrative proceedings, and thereby waived this argument. Moreover, although Plaintiff's alleged onset date was in January 2018, Plaintiff cites no mental health treatment records before April 2019, and the record shows that Plaintiff's symptoms and functioning improved significantly only a few months after his treatment began. Thus, the record as a whole supports the ALJ's finding that Plaintiff was not disabled for any twelve-month period during the relevant period.

ECF No. 10-1 at pp. 2-3.

The Court has considered the parties' submissions, including Plaintiff's reply, and the

entire administrative record.

DISCUSSION

Plaintiff primarily maintains that the ALJ's RFC finding is erroneous, since it fails to adequately account for his inability to interact with co-workers and supervisors, and that that such error is the result of the ALJ's failure to properly evaluate the medical opinion evidence. Basically, Plaintiff alleges that the medical opinion evidence, including the opinions that the ALJ claimed to find persuasive, do not support the ALJ's determination that Plaintiff retained the RFC to perform simple work that does not involve either complex interaction or joint effort with others at work, or contact with the public.   Plaintiff contends, rather, that if the ALJ had properly evaluated the medical opinion evidence, she would have necessarily limited him even further, to work involving no more than "minimal supervision and interaction with others."

Plaintiff alleges, for example, that since the ALJ claimed to find the opinions of the agency review physicians "persuasive," she erred in not following their recommendations and limiting Plaintiff to "minimal supervision and interaction with [co-workers]."[20]   Indeed, Plaintiff contends that the ALJ erred by failing to explain why she did not "include any limitations to supervision."[21] Plaintiff further alleges that insofar as the ALJ found the opinions of the agency review physicians persuasive, she was bound to limit Plaintiff to only minimal interaction with co-workers, instead of merely limiting him to work not "requiring more complex interaction or joint effort to achieve work goals," which, he maintains, is insufficient for that purpose:

> Limiting Plaintiff to "work [not] requiring more complex interaction or joint effort to achieve work goals" is a far cry from limiting him to "minimal interaction with others" and, thus, does not properly account for these limitations.   "More complex

---

[20]  ECF No. 8-1 at p. 9.
[21]  ECF No. 8-1 at p. 10 ("The ALJ's limitation to avoiding work involving 'more complex interaction or joint effort to achieve work goals' does not address the inability to handle more than minimal supervision.   For example, there are no temporal limitations to interactions with supervisors (*i.e.*, occasional, less than occasional, never, etc.).")

> interaction" suggests a significant degree of interaction far above the level of "minimal" and, thus, even work up to the level of "more complex interaction exceeds the limitation to "minimal interaction with others."

ECF No. 8-1 at p. 11.   Rather, Plaintiff argues that the ALJ was required to include "temporal restrictions" on the amount of contact Plaintiff could have with co-workers.[22]

Further, Plaintiff maintains that it was inconsistent and erroneous for the ALJ to limit Plaintiff to "no contact" with the public, without similarly forbidding him from all contact with supervisors and co-workers.   Plaintiff contends that the ALJ erred in this regard, since the agency review physicians whom she found "persuasive" "did not make any distinction between Plaintiff's ability to interact with co-workers and the general public."[23] Further, Plaintiff argues that the ALJ misinterpreted a statement by Ngili, that Plaintiff would have difficulty at work or in public, to mean that Plaintiff would only have difficulty with work involving the public.[24]  Plaintiff insists that any such distinction between contact with supervisors and co-workers, on one hand, and contact with the general public, on the other hand, is not supported by the opinions of the agency review physicians, and is therefore "arbitrary."[25]

Indeed, Plaintiff indicates that any deviation by the ALJ from the opinions of the agency review physicians (that Plaintiff needed work involving "minimal supervision and interactions with others") was arbitrary, since the opinions of the agency review physicians are consistent with the medical evidence as a whole.   On this point, Plaintiff cites to a litany of statements from the record reflecting Plaintiff's subjective complaints about his purported inability to be around other

---

[22] ECF No. 8-1 at p. 11.
[23] ECF No. 8-1 at p. 11; *see also, id.* at p. 12 ("The ALJ does not provide any valid reasons why Plaintiff can interact with coworkers (or supervisors) to a greater degree than [with] the public.").
[24] ECF No. 8-1 at p. 12.
[25] ECF No. 8-1 at pp. 12-13.

people.[26]

In sum, Plaintiff argues that the ALJ erred in failing to strictly adopt the opinions of the agency review physician and the consultative examiner, purportedly since they all agreed that Plaintiff should have only minimal interaction with supervisors, co-workers, and the public.   In this regard, and uncharacteristic of most disability plaintiffs, Plaintiff here places great emphasis on the opinions of agency review physicians, and on the opinion of a consultative examiner, presumably because, as mentioned earlier, the questionnaire from his own *treating* mental health providers fails to indicate that he has *any* limitation on his ability to interact with other people.

Plaintiff also contends that the ALJ erred in her treatment of the opinions from his treatment providers.   On this point, the reader will recall that the treatment providers (NP Ngili and LMSW Hostrander) completed a two-page check-the-box questionnaire, asserting that Plaintiff had "marked" limitations in maintaining regular attendance without interruptions from psychologically-based symptoms and in performing activities within a schedule, and "extreme" limitation in the "ability to respond appropriately to ordinary stressors in a work setting with simple tasks." (Tr. 480).   The ALJ found those opinions "not very" persuasive, which Plaintiff contends was erroneous and unsupported by substantial evidence.

In this regard, Plaintiff contends, first, that the ALJ did not adequately explain *how* the largely-normal mental status exam findings contradicted the opinions of Ngili and Hostrander.

Next, and relatedly, Plaintiff asserts that mental-health problems are not necessarily susceptible to evaluation using objective testing, and that the ALJ over-emphasized objective

---

[26]  ECF No. 8-1 at pp. 13-14.

findings, such as the largely-normal mental status exam findings, while simultaneously under-emphasizing his subjective complaints.   On this point, Plaintiff essentially contends that the ALJ should have considered that normal mental-status exam results do not necessarily refute his subjective assertions that he is unable to function at work and around crowds, since such examinations take place in a medical office, away from those "triggers."[27]   Further, Plaintiff alleges that mental-status exams generally only test areas of functioning that "have little or nothing to do with the anger, irritability, and aggression issues" that allegedly prevent him from interacting with others at work.[28]   At the same time, Plaintiff suggests that the ALJ improperly ignored mental status-examination findings that were supportive of his claim, such as observations that he appeared angry or annoyed on a few occasions.

Plaintiff additionally maintains that the ALJ erred, when evaluating the medical opinion evidence, by "myopically" focusing on the questionnaire from Ngili and Hostrander in isolation, rather than considering it along with treatment notes. That is, Plaintiff argues that the ALJ wrongly found that the opinions in the questionnaire were unsupported, since they were supported by "the overall treatment notes" from Ngili and Hostrander.[29]

Plaintiff further contends that the ALJ impermissibly relied on insubstantial evidence indicating that his mental-health condition improved significantly after taking medications, purportedly since the ALJ failed to consider "the overall longitudinal record evidence," "the known cyclical nature of psychiatric impairments,"   and the lack of connection between such

---

[27] ECF No. 8-1 at p. 16 ("None of these triggers are present in the supportive environment of his treating providers' examination room (or at home during telemedicine visits).")
[28] ECF No. 9=8-1 at p. 17.
[29] ECF No. 8-1 at p. 18.

improvement and the impact of Plaintiff's "anger issues" on his ability to work.[30]   Indeed, Plaintiff

asserts that "the longitudinal records do not show any significant and consistent improvement in

his anger issues."[31]   As evidence of this, Plaintiff again cites to a litany of statements from the

treatment record reflecting his subjective complaints about his purported inability to function

around other people despite taking medication.[32]

Plaintiff next contends that the ALJ failed to evaluate Dr. Slowik's consultative opinion in

accordance with 20 C.F.R. § 404.1520c(b)(2), since she failed to "articulate and explain how she

considered both the consistency and supportability factors." According to Plaintiff, the ALJ "[said]

not a word about the supportability factor," and failed to support her consistency analysis with

substantial evidence.[33]

Plaintiff further maintains that insofar as the ALJ failed to properly evaluate the evidence,

her RFC finding was inaccurate and her hypothetical questions to the VE did not accurately

reflect his abilities.   Plaintiff therefore contends that the ALJ's finding at the fourth step of the

sequential evaluation, as well as her alternative finding at the fifth step, both of which were based

on VE testimony, were erroneous, since they were based on inaccurate hypothetical questions

flowing from an inaccurate RFC finding.[34]

Finally, Plaintiff contends that the ALJ erred in failing to consider a closed period of

benefits.   On this point, Plaintiff argues that even if his condition improved with medication, as

the ALJ found, the ALJ should have considered whether he was entitled to benefits for some

---

[30] ECF No. 8-1 at p. 18.

[31] ECF No. 8-1 at p. 20.

[32] ECF No. 8-1 at pp. 18-20.

[33] ECF No. 8-1 at p. 20.

[34] *See, e.g.*, ECF No. 8-1 at p. 21 ("The hypothetical given to the VE did not include the appropriate limitations to Plaintiff's ability to be supervised or to interact with others.").

period prior to such improvement. *See*, ECF No. 8-1 at p. 22 ("It is particularly necessary for the ALJ to consider whether a closed period of disability existed where [the] record shows that [the] plaintiff's condition has improved significantly[.]") (citation omitted).

Defendant opposes Plaintiff's application for judgment on the pleadings, for the reasons already noted earlier and for additional reasons discussed below.

The Court, having considered the parties' submissions and the entire record, finds that Plaintiff's arguments lack merit.

As a preliminary matter, Plaintiff implies that because the ALJ found the opinions of the agency review physicians persuasive, she was required to insert their opinions, concerning Plaintiff's ability to interact with people, into the RFC finding, essentially verbatim.   However, that argument clearly lacks merit. *See, Davis v. Kijakazi*, No. 21CV8485VECBCM, 2023 WL 5726054, at *12 (S.D.N.Y. Aug. 18, 2023) ("Regardless of how many medical source statements the ALJ receives – or the weight he assigns to them – the determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or follow, any one medical opinion. *See Camille v. Colvin*, 652 F. App'x 25, 29 n.5 (2d Cir. 2016) (summary order) ("An ALJ may accept parts of a doctor's opinion and reject others."), report and recommendation adopted sub nom. *Davis v. Comm'r of Soc. Sec.*, No. 21-CV-8485 (VEC), 2023 WL 5723011 (S.D.N.Y. Sept. 5, 2023).   The issue for the Court, rather, is whether the ALJ's RFC finding is supported by substantial evidence. *See, id.* ("[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings.").

Similarly lacking in merit is Plaintiff's contention that the ALJ committed legal error by

failing to include further limitations on social interaction in the RFC finding (such as limitations on interaction with co-workers and supervisors), or, alternatively, by failing to adequately articulate why she did not incorporate such additional limitations.   In this regard, Defendant, citing *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014), contends that since the ALJ agreed with the agency review physicians that Plaintiff had only moderate non-exertional mental limitations, "no greater limitations were required in the RFC finding, which already limited Plaintiff to simple, unskilled work or a routine, repetitive, and non-public nature."   The Court generally agrees with that reasoning. *See, e.g., Jahmari R. v. Comm'r of Soc. Sec.*, No. 1:20-CV-0935 (WBC), 2022 WL 875166, at *5 (W.D.N.Y. Mar. 24, 2022) ("The Second Circuit has held that moderate limitations in work related functioning does not significantly limit, and thus prevent, a plaintiff from performing unskilled work.") (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); other citations omitted).   But, in any event, the ALJ went beyond merely limiting Plaintiff to simple work, and placed specific limitations on his ability to interact with other people. Although Plaintiff maintains that the RFC finding should have included greater restrictions on social interaction, the Court finds that the RFC finding is supported by substantial evidence.

Plaintiff next contends that the ALJ erred, in large part, by placing too much emphasis on his mostly-benign mental status exam findings and too little emphasis on his subjective complaints.   Courts in this Circuit have recognized that mental health impairments are often not susceptible to demonstration through objective evidence, and that ALJs must accordingly give proper consideration to a mental health treatment provider's assessment of claimant's subjective statements about his symptoms. *See, Ricottelli v. Saul*, No. 3:18CV01314(SALM), 2019 WL 11276514, at *12 (D. Conn. Sept. 26, 2019) ("In the context of mental health treatment, it is often

26

the case that psychological professionals are required to rely primarily on the statements of patients in forming their diagnoses and opinions; such "talk therapy" is the underpinning of psychiatric treatment and therapists may rely on subjective complaints elicited from patients during clinical interviews in formulating their medical opinions on functional limitations.") (quoting *Stasiak v. Berryhill*, No. 17CV00437(JJM), 2018 WL 5993732, at *3 (W.D.N.Y. Nov. 15, 2018)) (citations and quotation marks omitted).

Consequently, it can be error for an ALJ to discount a medical opinion concerning a mental health impairment simply because it is based on the claimant's subjective reports, or because it is otherwise not supported by objective findings. *See, Stacey v. Comm'r of Soc. Sec. Admin*., 799 F. App'x 7, 9 (2d Cir. 2020) ("[T]he ALJ's apparent expectation that a psychological opinion be formed only after diagnostic testing is unrealistic. A medical diagnosis will often be informed by the patient's subjective description of his or her symptoms.   That is all the more true in cases involving mental health, which tend to be less susceptible to objective testing and assessment.") (citations omitted).

On the other hand, there are circumstances where an ALJ may properly give less weight to a medical opinion that is based primarily on a claimant's subjective statements.   For example, "[a]n ALJ may disregard a medical opinion premised on a Plaintiff's self-reported symptoms if the ALJ has reason to doubt Plaintiff's credibility." *Stroud v. Astrue*, No. 09-CV-0357, 2010 WL 2671785, at *6 (W.D.N.Y. July 1, 2010) (citations omitted); *see also, id*. ("Here, the ALJ properly discounted Plaintiff's subjective complaints, because they were not supported by the record as a whole. Thus, the ALJ had adequate grounds to reject Dr. Schueler's opinions based on

Plaintiff's unsupported claims.").[35]

Here, as noted earlier, the ALJ found that Plaintiff's statements about the severity of his symptoms were not entirely credible or entirely consistent with the record, and the Court deems such finding to be amply supported in the record.   Consequently, the Court does not find that the ALJ erred by assigning lesser weight to medical opinions that, insofar as they indicated that Plaintiff had more-than-moderate limitations, were based entirely on Plaintiff's subjective complaints, as opposed to any objective findings.[36]

Plaintiff's assertion that remand is required because the ALJ failed to properly consider the opinion of Dr. Slowik as required by 20 C.F.R. § 404.1520c(b)(2) also lacks merit.   That section of the Commissioner's regulations, which applies to cases such as this that were filed after March 27, 2017, states, in pertinent part, that, "we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision." *Id.*

> The two "most important factors" for determining the persuasiveness of medical opinions are consistency and supportability, and an ALJ is required to "explain how [he] considered the supportability and consistency factors" for a medical opinion.

---

[35] *See also, Sophie H. v. Saul,* No. 5:18-CV-375 (CFH), 2019 WL 3975455, at *9 (N.D.N.Y. Aug. 22, 2019) ("It is well-settled that 'an ALJ may afford less weight to medical opinions that appear to be solely based on a plaintiff's subjective allegations.'" *Cruz v. Colvin,* 278 F. Supp. 3d 694, 699 (W.D.N.Y. 2017) (citation omitted) ("In assigning limited weight to the opinion of plaintiff's treating primary care physician, Dr. Sarah Porter, the ALJ observed that Dr. Porter's reports were inconsistent with the other evidence of record, and that the limitations she described appeared to be based solely on plaintiff's subjective complaints.").").

[36] Plaintiff essentially contends that the ALJ was required to accept his subjective complaints as true, since they cannot be disproven by anything his mental health treatment providers could observe in an office setting. This shows the extent to which the opinions of the mental health treatment providers are based entirely on his statements, which in turn shows the extent to which his claim turns on his credibility.   On this point, the Court notes that Plaintiff's treatment providers were working off the assumption that he had lost multiple jobs due to his inability to control his anger, since that is what he told them.   Apart from what he told them, they had no basis to evaluate how he would perform in a work setting, as Plaintiff points out in his papers.   However, Plaintiff's own statements about his alleged firings, set forth earlier, contain facts that he evidently did not relate to his therapists, and that do not actually support his assertion that he was fired from multiple jobs due to his inability to control his anger. *See,* footnote 12 above.

20 C.F.R. § 416.920c(b)(2).

With regard to "supportability," the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). The regulations provide that with regard to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. 416.920c(c)(2).

\*\*\*

An ALJ's failure to explain the supportability and consistency of the medical opinions in the record constitutes procedural error. *See Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019); *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, \*2 (2d Cir. June 17, 2022) (summary order) (finding that "the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record").[37] However, "if 'a searching review of the record' assures [the court] 'that the substance of the [regulation] was not traversed,'" the court may affirm the Commissioner's decision. *Loucks*, 2022 WL 2189293, at \*2 (quoting *Estrella*, 925 F.3d at 96 (*quoting Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004))).

*Jason A. L. v. Comm'r of Soc. Sec.*, No. 521CV477FJSTWD, 2022 WL 4354363, at \*2 (N.D.N.Y. Sept. 20, 2022).

In this case, the ALJ discussed the opinions of the agency review physicians, and the opinions of Ngili, Hostrander, and Slowik, respectively, in two successive paragraphs. (Tr. 22). In the first such paragraph, the ALJ indicated that she was "persuaded" by the opinions of the

---

[37] The Second Circuit has indicated that an ALJ should provide some degree of explanation on these points beyond merely indicating, for example, that he or she finds that an opinion is, or is not, well supported or consistent with the record. *See, Loucks v. Kijakazi*, 2022 WL 2189293 at \*2 ("Here, the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record.   .  . .   [T]he ALJ did not address the opinion's supportability or explain how the opinion was consistent with the record, except to conclude that it was.") (emphasis added).

agency review physicians, since they were "consistent" with, and "supported" by, the evidence overall, including the "mental status examinations in record," as well as statements in the treatment records, such as Ngili's statement that Plaintiff "should avoid working in places where he has to be confronted by public demands." (Tr. 22).   In the next paragraph, the ALJ contrasted that finding by indicating that she found the opinions of Ngili, Hostrander, and Slowik, "not very persuasive," for the opposite reasons.   That is, the ALJ indicated that the opinions of Ngili, Hostrander, and Slowik, were "contradicted by the mental status examinations in record," and therefore not "supported". (Tr. 22) ("While these clinical findings support the conclusion that the claimant has some mental restriction, they do not *support* the extreme restrictions identified by the opinions in this paragraph[.]") (emphasis added).   Plaintiff is correct that the ALJ did not also *expressly* indicate whether she also found Slowik's opinion, concerning greater-than-moderate limitations, to be "consistent" or "inconsistent" with the evidence overall, but the ALJ's entire discussion over the course of the two subject paragraphs rather clearly indicates that she did *not* find Slowik's opinion, insofar as it assessed greater-than-moderate limitations, to be consistent with the record overall.   Consequently, the Court finds that any procedural error by the ALJ on this point was harmless.

The Court further does not agree with Plaintiff that the ALJ failed to properly consider "the longitudinal record," or that she "cherry picked" evidence relating to Plaintiff's improvement, from taking medication, while ignoring evidence of an alleged "subsequent deterioration."   Plaintiff's arguments on these points amount to a disagreement over how the ALJ weighed the evidence. *See, Lisa M. o/b/o J.S. v. Comm'r of Soc. Sec.*, No. 1:21-CV-00292 EAW, 2023 WL 3943997, at *3 (W.D.N.Y. June 12, 2023) ("A disagreement with how the ALJ weighed the evidence is not a

valid basis to challenge the ALJ's determination.").

Plaintiff's contention that the ALJ erred by failing to consider a closed period of disability also lacks merit.   In that regard, the ALJ expressly found that Plaintiff was not under a disability at any time between the alleged disability onset date and the date of her decision, and Plaintiff has not shown that a reasonable factfinder would be required to find otherwise.

Plaintiff's remaining arguments concerning alleged errors by the ALJ at the fourth and fifth steps of the sequential evaluation are premised on the contention that the RFC finding was the product of legal error and/or unsupported by substantial evidence.   However, as just discussed, the Court finds that the arguments concerning legal error lack merit, and that the RFC finding is supported by substantial evidence.   Consequently, those remaining arguments are also denied.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 8) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 10) for the same relief is granted. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       September 26, 2023

ENTER:

_Charles J. Siragusa_
CHARLES J. SIRAGUSA
United States District Judge